United States District Court
Middle District of Florida
Jacksonville Division

JOHN KEANE,

   *Plaintiff,*

V.            No. 3:16-CV-1595-J-20PDB

JACKSONVILLE POLICE FIRE AND
PENSION FUND BOARD OF TRUSTEES,

   *Defendant.*

---

# Order

Before the Court are John Keane's opposed motion to disqualify the Office of General Counsel of the City of Jacksonville from further representing the Jacksonville Police and Fire Pension Fund Board of Trustees in this action, Doc. 17, the Board's response, Doc. 20, Keane's reply, Doc. 23, and the Board's opposed motion for leave to file a surreply, Doc. 24.

## Background

On December 29, 2016, Keane filed an amended complaint against the Board. Doc. 4. He alleges the following facts.

The Marvin B. Clayton Firefighter Pension Trust Fund Act, codified at chapter 175 of the Florida Statutes, calls for the creation of pension funds for firefighters throughout Florida, sets standards for firefighter pensions in municipalities throughout Florida, establishes a "Firefighter's Pension Trust Fund" in each municipality in Florida, and provides for the creation of independent boards of trustees to administer pension funds. Doc. 4 ¶¶ 7, 8; *see* Fla. Stat. § 175.021 (legislative declaration concerning the Act). The Act contains provisions on the

boards' powers, responsibilities, and independence from municipalities in which they operate. Doc. 4 ¶¶ 9–12. The Marvin B. Clayton Police Officers Pension Trust Fund Act, codified at chapter 185 of the Florida Statutes, contains similar provisions for pension funds for police officers. Doc. 4 ¶¶ 13–15.

To implement those laws, the Florida legislature established by special act the Jacksonville Police and Fire Pension Board of Trustees as an independent agency and empowered it to enter into contracts, leases, or other transactions; employ and fix the compensation of an administrator and any consultants; and have all other powers it reasonably determines necessary or appropriate to the performance of its duties in administering pensions for employees of the Jacksonville Sheriff's Office and Jacksonville Fire and Rescue Department. Doc. 4 ¶¶ 6, 16–17; *see* Laws of Fla., ch. 90-443, § 2; Laws of Fla., ch. 92-341, § 1; Charter of the City of Jacksonville, Article 22, § 22.04. The special act distinguishes Board employees from city employees and repeals any inconsistent provisions in the city's charter. Doc. 4 ¶¶ 18–19.

In the past, the Office of General Counsel has claimed it cannot represent the Board because chapters 175 and 185 "create a present or potential conflict of interest" and the Board is not the city but an independent agency. Doc. 4 ¶ 21. The Board is "an independent agency from the City [of Jacksonville], created wholly by state law, that acts as the sole judge of the terms and administration of the Fund, subject only to judicial review." Doc. 4 ¶ 22.

Keane is the Board's former executive director and administrator. Doc. 4 ¶ 4. His initial employment contract with the Board was effective August 1, 1990. Doc. 4 ¶ 23.

On September 1, 1991, the Board entered into a financial services contract with the city for the city to provide administrative services for the Board, including distributing pension payments as determined by the Board. Doc. 4 ¶ 24; Doc. 4 at 22−26.

On September 20, 2000, the Board adopted a Senior Staff Voluntary Retirement Plan ("SSVRP") to compensate its "senior staff members," some of whom were ineligible to participate in a pension plan for city employees. Doc. 4 ¶ 25; Doc. 4 at 38−56. The Board made itself the SSVRP's exclusive administrator. Doc. 4 ¶ 27.

Under the SSVRP, a member with five years of Board service who contributes seven percent of his or her compensation may receive retirement benefits upon turning 65 in the form of biweekly payments of three percent of the average final compensation for each year of credited service. Doc. 4 ¶¶ 28, 29. The Board has an employer identification number with the Internal Revenue Service for SSVRP members and contributes to social security for SSVRP members, while the city makes no such contributions for city employees. Doc. 4 ¶ 20.

On June 20, 2003, the Board's financial services contract with the city was restated and continued to obligate the city to distribute pension payments as determined by the Board. Doc. 4 ¶ 32. Since the SSVRP's inception, the Board has reported the SSVRP's existence and cost in annual budget submissions to the city and recorded contributions in its own database. Doc. 4 ¶ 33.

On February 12, 2004, Keane's employment contract with the Board was restated. Doc. 4 ¶ 30; Doc. 4 at 28−56. (The restated contract has been amended five times. Doc. 4 ¶ 30.) The restated contract incorporates the SSVRP and attaches it as an exhibit. Doc. 4 ¶ 31; Doc. 4 at 28−56. Since Keane began participating in the SSVRP, he has complied with all SSVRP requirements, including making all required contributions. Doc. 4 ¶¶ 34, 37.

On September 25, 2015, the Board approved Keane's application for retirement, and effective October 1, 2015, he began receiving benefits under the SSVRP. Doc. 4 ¶¶ 36, 37. He continued to receive benefits after a cost-of-living adjustment on January 1, 2016. Doc. 4 ¶ 38. Two others also receive benefits under the SSVRP. Doc. 4 ¶ 35.

The city now contests the legitimacy of the SSVRP. Doc. 4 ¶ 39.

On August 9, 2012, John Crescimbeni (a city councilman) asked Cindy Laquidara (the city's then-General Counsel) to provide an opinion on the Board's authority to establish the SSVRP. Doc. 4 ¶ 40. Laquidara issued a memorandum suggesting the Board lacked authority to establish the SSVRP based on a reading of Article 16 of the city's charter providing only the City Council may amend the pension system for city employees. Doc. 4 ¶¶ 41, 42. In response, the Board sought an opinion from Robert Klaussner (the Board's then-counsel). Doc. 4 ¶ 44. He issued an opinion stating the Board was not subject to Article 16 and possessed authority to establish the SSVRP. Doc. 4 ¶ 44.

Klaussner's opinion went "largely unchallenged" for three years, during which Keane retired and received benefits under the SSVRP. Doc. 4 ¶ 45.

On November 20, 2015, the city sued Keane, the Board, and the two others receiving benefits under the SSVRP. Doc. 4 ¶ 46; *see City of Jacksonville v. Jacksonville Police Fire Pension Board of Trustees etc.*, No. 16-2015-CA-007380 (Fla. 4th Cir. Ct.). The city sought a declaration the Board lacked authority to establish the SSVRP. Doc. 4 ¶ 46.

On February 9, 2016, citing Laquidara's memorandum, the city amended its charter to expressly prohibit the Board from establishing or administering any retirement plan other than the Jacksonville Police and Fire Pension Fund. Doc. 4 ¶ 47. Two months later, on April 20, 2016, Jason Gabriel (the city's General Counsel) issued an advisory opinion to Lenny Curry (the city's Mayor) "echoing" Laquidara's memorandum and relying on section 7.02 of the city's charter. Doc. 4 ¶¶ 48, 49. (Section 7.02 provides, "The head of the office of general counsel shall be the general counsel who shall be the chief legal officer for the entire consolidated government, including its independent agencies. … Any legal opinion rendered by the general counsel shall constitute the final authority for the resolution or interpretation of any

legal issue relative to the entire consolidated government and shall be considered valid and binding in its application unless and until it is overruled or modified by a court of competent jurisdiction or an opinion of the Attorney General of the State of Florida dealing with a matter of solely state law.")

On April 21, 2016—the day after Gabriel issued the advisory opinion—the city voluntarily dismissed the state-court action against Keane, the Board, and the other SSVRP benefit recipients. Doc. 4 ¶ 51.

A few weeks later, on May 9, 2016, Michael Weinstein (the city's Director of Finance and Administration) sent Keane a letter informing him his benefits under the SSVRP would be terminated and he instead would receive the lesser payments to which he would have been entitled if eligible to participate in the city's pension plan. Doc. 4 ¶¶ 52, 53; Doc. 4 at 80. Weinstein cited Gabriel's advisory opinion. Doc. 4 ¶ 52; Doc. 4 at 80.

Keane demanded the Board provide benefits under the SSVRP, but the Board refused and has not tried to enforce the financial services contract with the city that requires the city to pay amounts determined by the Board. Doc. 4 ¶¶ 54, 55. Since May 9, 2016, the Board has issued Keane only the lesser payments calculated by Weinstein. Doc. 4 ¶ 56.

Based on those alleged facts, Keane brings a claim under 42 U.S.C. § 1983, contending the Board violated the Fourteenth Amendment's procedural due process clause by reducing his benefits without notice or an opportunity to be heard (count I), a claim under § 1983, contending the Board violated the Fifth Amendment's takings clause by reducing his benefits without just compensation (count II), a claim for breach of contract, contending the Board breached the restated contract with him by failing to pay him benefits under the SSVRP (count III), and a claim for promissory estoppel, claiming the Board is estopped from failing to pay him benefits under the SSVRP (count IV). Doc. 4 ¶¶ 57–79. He requests actual and compensatory damages,

a declaration that the Board had authority to establish the SSVRP and must pay him the amount due under the SSVRP, injunctive relief restoring his benefits under the SSVRP and the restated contract, reasonable costs and attorney's fees, and any other just and proper relief. Doc. 4 ¶¶ 61, 69, 73, 79.

On January 24, 2017, the Office of General Counsel appeared on behalf of the Board to request an extension of time to respond to the amended complaint. Doc. 7. The Court granted the motion, Doc. 8, and on February 6, 2017, the Board filed a motion to dismiss, Doc. 9. The Board argues Keane fails to state a claim for a violation of a constitutional right and the Court should decline to exercise jurisdiction over the state-law claims. Doc. 9. On March 2, 2017, Keane filed a response in opposition. Doc. 12. The motion is pending.

On March 16, 2017, the parties' attorneys filed a case management report. Doc. 13. They did not request a preliminary pretrial conference to address any unresolved issue or present any matter for the Court's preliminary consideration. *See generally* Doc. 13. Based on the dates requested by the parties, the Court entered a case management and scheduling order setting a December 15, 2017, deadline for completing discovery, a February 9, 2018, deadline for filing any dispositive motion, and a trial during the term beginning August 6, 2018. Doc. 14.

## Motion to Disqualify Counsel

On June 30, 2017, Keane filed the motion to disqualify the Office of General Counsel from further representing the Board in this action. Doc. 17.

Citing Rule 4-1.7 of the Rules Regulating The Florida Bar ("Conflict of Interest; Current Clients"), Keane contends the Board is "an entity distinct from the City, created by state law," and the Board and city often have conflicting interests. Doc. 17 at 1–2. He points to a 1987 letter from James Harrison (the city's then-General Counsel) stating the Office of General Counsel could no longer represent the Board because chapters 175 and 185 "create relationships, which despite all good intentions,

place our attorneys in either a present or potential conflict of interest," and, "I will not quote the rules regulating the Florida Bar. Suffice it to say, professional ethics require me to make this decision as being in the best interest of your Board and the City at this time." Doc. 17 at 2; Doc. 17-1. Keane points to the fact that the same attorneys representing the Board in this action represented the city against the Board in the state-court action. Doc. 17 at 3; Doc. 17-2. Keane points to Gabriel's advisory opinion, including a portion in which Gabriel chastises the Board for "'obstinacy'" regarding establishment of the SSVRP and the Board's "'insistence that it has complete authority over its administrative expenses.'" Doc. 17 at 3–4; Doc. 17-3. And Keane points to the Board's initial disclosures in this action that include letters, memoranda, and opinions by current and former members of the Office of General Counsel regarding the Board's lack of authority to establish the SSVRP. Doc. 17 at 4; Doc. 17-4.

Keane argues Gabriel's advisory opinion conflicts with the Board's prior position it has authority over its financial decisions and administrative expenses and "the Board's … institutional interest in maintaining its autonomy from the City," and expresses concern the General Counsel will rely on the same legal argument it used in state-court action: "that the Board does not have autonomy over its own financial decisions, and is beholden to the legal determinations of the City's General Counsel." Doc. 17 at 4–5. He contends the General Counsel's "strong incentive to make an argument that will enhance the City's (and its own office's) control over the Board … creates an irreconcilable conflict of interest between … the City and the Board," the conflict is imputed to all attorneys in the Office of General Counsel, and representation of the Board creates both apparent and actual impropriety. Doc. 17 at 5, 7. He compares the General Counsel's representation of the Board to the "fox being left to guard the henhouse" and contends the city is "puppeteering the Board to achieve the same remedy that it previously sought in its lawsuit against the Board." Doc. 17 at 7–8.

The Board responds Keane has no standing to seek disqualification of the Office of General Counsel because he has no attorney-client privilege to assert, and disqualification is unwarranted. Doc. 20. Its arguments focus on the relationship and balance of power between the consolidated government, the Board, and the Office of General Counsel. *See generally* Doc. 20. It contends the Office of General Counsel's attorneys differ from private attorneys because the Florida Legislature mandates the former's representation of multiple units of the government, compares the Office of General Counsel to state attorneys general, cites legal provisions it contends show the Board is part of the consolidated government the Office of General Counsel represents, cites cases to show state courts have repeatedly recognized its role in representing the consolidated government, and asserts it represents the interests of the entire consolidated government instead of any particular unit. Doc. 20 at 2–4, 6, 7–11, 12–16; Docs. 20-1, 20-2, 20-3, 20-5, 20-7, 20-8. It observes the Office of General Counsel has not changed positions on the legality of the SSVRP and the 1987 letter stating there is a conflict of interest between the Board and the Office of General Counsel is no longer valid, and contends disqualifying the Office of General Counsel would harm the Board because it has the most institutional knowledge about the Board. Doc. 20 at 3, 5, 15; Doc. 20-6.

Keane replies the Office of General Counsel has no authority to control the Board, the City is "inconsistent in the degree of authority or responsibility it claims to have over its agencies and independent agencies," the relationship between the Office of General Counsel and the Board is not analogous to the relationship between an attorney general and a state agency, he has standing because the conflict of interest is severe enough to call into question the fair and efficient administration of justice and standing rules are relaxed for conflicts involving counsel for a public entity, and the Office of General Counsel omits any indication the Board "has waived th[e] conflict of interest or even acquiesced to the General Counsel's representation in the first place." Doc. 23. He points to laws cited in the amended complaint, Docs. 23-1, 23-2; a declaration by him concerning Harrison's letter, the Board's practice of

hiring independent legal counsel for its legal needs, the Board's vote to approve his pension benefits, and the absence of any Board vote to revoke his pension benefits, Doc. 23-3; docket sheets and filings from the state-court action and other actions, Doc. 23-4; an article on City Council's refusal to hold a public workshop on a dredging proposal because an independent authority voted for the project, Doc. 23-5; and a filing from another case in which the city argues a spoliation motion for loss of a document by the Jacksonville Human Rights Commission should be analyzed as a third-party spoliation claim, Doc. 23-6.

## Law

"[L]awyers are essential to the primary governmental function of administering justice, and have historically been officers of the courts." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) (internal quotation marks omitted). A court thus has the "power and responsibility to regulate the conduct of attorneys who practice before it." *United States v. Kitchin*, 592 F.2d 900, 903 (5th Cir. 1979); *see also United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir. 1994) (a court "must protect its independent interest in ensuring that the integrity of the judicial system is preserved").

"A motion to disqualify counsel is the proper method for a party-litigant to bring the issues of conflict of interest or breach of ethical duties to the attention of the court." *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980). A party may also or instead pursue bar disciplinary proceedings. *Prudential Ins. Co. of Am. v. Anodyne, Inc.*, 365 F. Supp. 2d 1232, 1237 (S.D. Fla. 2005).

A disqualification motion is governed by local rules and federal common law. *Herrmann v. GutterGuard, Inc.*, 199 F. App'x 745, 752 (11th Cir. 2006). The movant must prove the grounds for disqualification. *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003). If a court bases disqualification on an ethical violation, "the court may not simply rely on a general inherent power to admit and suspend attorneys,

without any limit on such power." *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). Instead, the court must identify a rule and find the lawyer violated it. *Id.*

Disqualification is a "blunt device." *Prudential*, 365 F. Supp. 2d at 1237 (quoted authority omitted). Among other costs resulting from disqualification, "it may be difficult for a replacement attorney to fully master factual and legal nuances in a complex case, … impairing the adversarial process." *Id.*

Because a litigant is presumptively entitled to counsel of its choosing, only a compelling reason will justify disqualification. *BellSouth*, 334 F.3d at 961. Because disqualification is a "harsh sanction," it "should be resorted to sparingly." *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982). And because a disqualification motion may be used to harass or for tactical advantage, it should be viewed with caution. *Herrmann*, 199 F. App'x at 752.

Disqualification is not mandatory, even if a court finds a lawyer is violating a conflict-of-interest rule. *Prudential*, 365 F. Supp. 2d at 1236. Instead, a "court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests." *Woods v. Covington Cty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976).

In undertaking the balancing, pertinent factors may include the nature of the ethical violation, the age of the action, the prejudice to the parties, the effectiveness of counsel in light of the violation, the public's perception of the profession, and whether the attempt to disqualify is a tactical device or a means of harassment. *See Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 731–32 (11th Cir. 1988) (considering some of those factors); *Arrowpac Inc. v. Sea Star Line, LLC*, No. 3:12-CV-1180-J-32JBT, 2013 WL 5460027, at *12 (M.D. Fla. Apr. 30, 2013) (unpublished) (same); *Prudential*, 365 F. Supp. 2d at 1237 (same).

The Local Rules provide that the Rules Regulating The Florida Bar govern members of the Court and attorneys specially admitted to appear before the Court. Local Rule 2.04(d).

Rule 4-1.7 of the Rules Regulating The Florida Bar "concerns conflicts of interests with current clients." *Young v. Achenbauch*, 136 So. 3d 575, 581 (Fla. 2014). It prohibits a lawyer from representing a client if the representation of one client will be directly adverse to another client or if there is a substantial risk the representation of a client will be materially limited by the lawyer's responsibilities to another client unless the lawyer obtains informed consent. Rule 4-1.7. "Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated." Rule 4-1.7, Comment ("Loyalty to a client").

Rule 4-1.7 is based on two principles. *Hilton v. Barnett Banks, Inc.*, No. 94-1036-CIV-T24(A), 1994 WL 776971, at *3 (M.D. Fla. Dec. 30, 1994) (unpublished). "First, a client is entitled to his lawyer's undivided loyalty as his advocate and champion." *Id.* (internal quotation marks omitted); *accord* Rule 4-1.7, Comment ("Loyalty to a client") ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."); *Chapman v. Klemick*, 3 F.3d 1508, 1512 (11th Cir. 1993) (a lawyer's duty of loyalty to his client is "very nearly sacred"); *Gerlach v. Donnelly*, 98 So. 2d 493, 498 (Fla. 1957) (a lawyer must represent a client and handle the client's affairs with the "utmost degree of honesty, forthrightness, loyalty and fidelity"). "Second, a lawyer should never place himself in a position where a conflicting interest may, even inadvertently, affect the obligations of an ongoing professional relationship." *Hilton*, 1994 WL 776971, at *3.

Commentary to other rules clarify the rules do not define conflicts of interest in the government context. *See* Rule 4-1.11, Comment ("The question of whether [two] government agencies should be regarded as the same or different clients for conflict of interest purposes is beyond the scope of these rules."); Rule 4-1.13, Comment ("Government agency") ("[D]uties of lawyers employed by the government … may be

defined by statutes and regulation. Defining precisely the identity of the client and prescribing the resulting obligations of such lawyers may be more difficult in the government context and is a matter beyond the scope of these rules.").

Commentary to Rule 4-1.7 provides the lawyer undertaking representation bears the primary responsibility for resolving questions of conflicts of interest, but opposing counsel may raise the question if the conflict "clearly call[s] in question the fair or efficient administration of justice." Rule 4-1.7, Comment ("Conflict charged by an opposing party"); *accord McGriff v. Christie*, 477 F. App'x 673, 676–77 (11th Cir. 2012) (applying Georgia law interpreting an identical comment to the Georgia Rules of Professional Conduct; "A party who is not a former client of opposing counsel nevertheless has standing to raise the issue of opposing counsel's conflict of interest if there is 'a violation of the rules which is sufficiently severe to call in question the fair and efficient administration of justice'"); *see also In re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976) (holding opposing counsel has standing to bring an ethical violation to a court's attention if applicable ethical rules require counsel to do so); *Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671, 673 (5th Cir. 1977) (holding a party has standing to seek disqualification of opposing counsel even if the party is not the aggrieved client if the party's attorneys are "authorized" to report the ethical violation).

The commentary further provides an objection by opposing counsel should be viewed with caution because it could be a means of harassment. Rule 4-1.7, Comment ("Conflict charged by an opposing party"). Indeed, "[a]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 88 (5th Cir. 1976). "The relationship between an attorney and his client is personal." *Id.* at 90. "The prohibition applied to attorneys against representation of conflicting interests rests on the duties of an attorney arising from the attorney-client relationship. In the absence of this relationship, the duties of loyalty and

confidentiality do not arise" and standing is absent. *Id.* (internal citation omitted). "To allow an unauthorized surrogate to champion the rights of the former [or current] client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist." *Id.* A "narrow exception[] to this general rule" is when the conflict of interest is "manifest and glaring," thereby confronting a court with "a plain duty to act." *Id.* at 89.

## Analysis

Evident from the parties' extensive briefing and the commentary to the Rules Regulating The Florida Bar concerning government lawyers, the asserted conflict of interest is not "manifest and glaring" so as to confront the Court with a "plain duty" to disqualify the Office of General Counsel from further representing the Board in this action at the request of someone who is not an aggrieved current or former client and who has a strategic interest in disqualification. *See Yarn,* 530 F.2d at 89. And to the extent there is a conflict of interest, it is insufficiently severe to call in question the fair and efficient administration of justice (whereas disqualification could for reasons that follow). *See McGriff,* 477 F. App'x at 676–77. Denying the motion to disqualify based on the absence of standing is warranted.

Balancing the interests compels the same decision. The nature of the asserted conflict of interest is unique and involves complicated issues concerning governmental relationships and historical practices best left resolved if at all not in deciding whether opposing counsel should be disqualified but in deciding the merits of the claims. Tellingly, Keane cites some of the same authority in his motion to support disqualification as he does in his amended complaint to support the claims. *Compare* Doc. 4 ¶¶ 7, 10, 13, 16, 17, 19, 21, *with* Doc. 17 at 1–4 *and* Doc. 23 at 2–4 (citing chapters 175 and 185 of the Florida Statutes, the city's charter, and the General Counsel's previous position stated in Harrison's 1987 letter). Overlap of matters concerning disqualification and substantive merit causes pause.

The Office of General Counsel's representation of the Board here but against the Board in the state-court action is unlikely to damage the public's perception of the profession. The Office of General Counsel has maintained the same position in both actions, the city voluntarily dismissed the state-court action, and the distinction between the city and the Board is not widely known or understood. Even the highly experienced attorneys on both sides disagree on whether the Office of General Council's representation of the Board is proper, and they present at least colorable arguments to support their respective positions.

This action has been pending since last year, Keane raised no conflict of interest as a matter warranting preliminary consideration in the case management report, he waited more than five months from the Office of General Counsel's first appearance to file the motion to disqualify, the discovery deadline is only three months away, and disqualifying the Office of General Counsel and allowing new counsel time to get up to speed will interfere with case management.

Permitting the Office of General Counsel to continue representing the Board will not prejudice Keane beyond maintenance of Board positions adversarial to his positions, while disqualifying the Office of General Counsel would prejudice the Board financially (it would have to pay new counsel to start anew and do some of the same work the Office of General Counsel has already done) and strategically (the Office of General Counsel has expertise on the pertinent law and the most institutional knowledge about the Board besides perhaps Keane himself from his years as its executive director and administrator). Related to the latter point, because it would be difficult to find a replacement to "fully master factual and legal nuances" in this complex action, disqualifying the Office of General Counsel could impair the adversarial process. *See Prudential*, 365 F. Supp. 2d at 1237 (quoted).

Keane has presented no good reason to think the asserted conflict of interest will compromise the effectiveness of the Office of General Counsel in defending the Board against the claims made against it in this action. If the Board decides the

effectiveness of the Office of General Counsel is compromised, less than robust, or contrary to the Board's interests, the law that Keane himself cites makes clear the Board can hire new counsel. *See* Fla. Stat. §§ 175.061(4), 185.05(4) (giving pension boards the power and responsibility to "defend lawsuits of every kind, nature, and description"); Fla. Stat. §§ 175.071(7), 185.06(6) (allowing pension boards to hire independent counsel or use a municipality's counsel under terms found acceptable to help meet responsibilities).

Every motion to disqualify requires consideration of unique circumstances, and the current motion is no exception. For that reason, the cases on which Keane relies do not persuade the Court disqualification is warranted. *See* Doc. 17 at 7–8; Doc. 23 at 6 (relying on *McGriff*, 477 F. App'x at 677 and *Kenn Air Corp. v. Gainesville-Alachua Cty. Reg'l Airport Auth.*, 593 So. 2d 1219 (Fla. 1st DCA 1992)).

The Court **denies** the motion to disqualify the Office of General Counsel from further representation of the Board, Doc. 17. Finding a surreply unnecessary, the Court **denies** the Board's motion for leave to file one, Doc. 24.

**Ordered** in Jacksonville, Florida, on September 15, 2017.

Patricia D. Barksdale
*United States Magistrate Judge*

c:      Counsel of Record